Una O. SINGLETON, Plaintiff-Appellant,

v.

Donald L. SINGLETON,
Defendant-Respondent.

No. KCD 26511.

Missouri Court of Appeals,
Kansas City District.

June 2, 1975.

Motion for Rehearing and/or Transfer
Denied July 7, 1975.
Application to Transfer Denied
Sept. 8, 1975.

Raymond C. Lewis, Jr., Dale C. Doerhoff, Columbia, for plaintiff-appellant.

Terence C. Porter, William D. Powell, Columbia, for defendant-respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

DIXON, Chief Judge.

This is an appeal from a judgment in a suit for a divorce and an action for partition and other equitable relief relating to real and personal property. The judgment was for plaintiff, and plaintiff appeals, contending only that the trial court erred in the determination of plaintiff's rights in certain property. The defendant has not filed a cross appeal, and the issue of the granting of the divorce is no longer in the case.

The appeal is of extraordinary complexity. To illustrate this complexity, the transcript contains 1,416 pages, and 131 exhibits were offered, most of which were composites of the financial transactions of the parties over a period of five years. The amended petition upon which the case was tried consists of VI counts on twenty transcript pages, and the decree that is challenged covers fifteen transcript pages. What has been stated demonstrates that no opinion in ordinary format can frame and resolve the issues presented. It has become necessary to adopt a format that will make more intelligible the necessarily long opinion.

A brief explanation of the marital history and resume of the various properties involved will serve to explain the various divisions into which the subsequent opinion is divided.

The plaintiff and defendant were married November 1, 1965. The plaintiff, Una O. Singleton, was 53 years of age and was a widow. She had inherited substantial properties from her first husband who had died some five years prior to the 1965 marriage to the defendant. She had three children by her first husband, two daughters and a son. One of the daughters and the son had attained majority at the time of the 1965 marriage, and the remaining daughter was in her late teens. The defendant, Donald L. Singleton, was 32 years of age in 1965 at the time of the marriage. He was then a part owner of an Oldsmobile sales agency.

For five years after this marriage ensued the most bizarre financial transactions imaginable. Among these are adventures in the stock market, repetitive trading of motor vehicles, sale of the substantial interest of plaintiff in the savings and loan association her husband had left her for cash and a work contract, purchase of two boats, sale of securities, pledge of the childrens' savings accounts, investments in a nebulous enterprise "to purchase life insurance stocks," purchase of real estate development stock, purchase of the Mizzou Motel, and, finally, the building of an ornate residence in Columbia, Missouri.

It is clear that each owned separate property at the time of the marriage. It is, likewise, clear that at the time of separation some of the property was jointly held and some of the properties had remained the sole property of the wife and that the husband had acquired property in his own name which he did not own at the time of the marriage.

All of this tangled web of marital finance related above is unaided by any semblance of professional accounting and further confusion is engendered by the inevitable battle for the records following the separation of the parties.

This web of financial woe is overlaid with the usual story of marital discord. From a too early intimacy, the relationship of plaintiff and defendant progressed from an "ideal relationship" to utter matrimonial disaster in five years. Chief among the complaints of the defendant as to the cause of marital discord was the plaintiff's claimed indifference to sex. Plaintiff counters with the assertion defendant drank to excess, and his claim of physical abuse by her is by her account justified by his drunkenness. Ultimately, the evidence discloses that whatever the plaintiff's later indifferent attitude towards sex may have been, the defendant did not suffer any deprivation. Long prior to any such complaint on his part, the evidence disclosed a variety of sexual dalliance by him. On his own admission, reluctantly made on cross examination, he admitted to sexual improprieties

with five separate females, many of which occurred prior to any other claim by him of marital discord occasioned by plaintiff's actions. So also, plaintiff, by undisputed evidence, showed innumerable instances of his having girls delivered by a handyman to him at the Mizzou Motel. They would be esconced in "Room 15" and thence would be dispatched a "bottle" by the handyman. The inference from this conduct, coupled with the admissions of the defendant, makes these occasions highly suspect as occasions of infidelity.

Condensing plaintiff's claims stated under seven points in the brief to their essential thrust, they may be paraphrased as follows.

Plaintiff claims that she did not receive adequate overall equitable relief because the overwhelming weight of the evidence was for plaintiff, and defendant's credibility was destroyed. She further asserts that the existence of a fiduciary relationship made the granting of further equitable relief mandatory.

Specifically, plaintiff claims the decree denies her the following relief:

1) A constructive trust or equitable lien on property she contributed to the marriage, either directly or which was purchased from funds she contributed. Without waiving claims to other assets, plaintiff claims equitable ownership of all of the "Mizzou Motel" and the jointly owned dwelling house constructed by the parties.

2) Attorney fees and alimony.

Defendant counters by asserting that no resulting or constructive trust can arise since the properties in question were jointly owned and purchased from funds flowing through a joint bank account; further, that the evidence does not establish or prove any fraud or overall scheme, and the plaintiff has not factually supported her claim to alimony and attorney fees.

The primal issue, therefore, is the determination of the plaintiff's right to broad equitable relief. It must be concluded upon the entire record that such relief should have been afforded to the plaintiff.

■ The fundamental basis for the finding that the plaintiff is entitled to broad equitable relief is the determination by this court that this record demonstrates a fixed design and scheme by the defendant to accomplish the transfer of what was the plaintiff's separate estate to either jointly owned properties or his own individual name.

■ As plaintiff has asserted, this case is heard *de novo* on the whole record, and it is this court's obligation to determine the weight of the evidence and render its own judgment on that review of the facts. *Bates v. Morris,* 467 S.W.2d 286 (Mo.App. 1971); *Rutherford v. Rutherford,* 444 S.W.2d 439 (Mo.1969); *Franke v. Franke,* 447 S.W.2d 308 (Mo.1969). The defendant does not challenge that obligation of this court. From the voluminous transcript and numerous exhibits, the following facts can be found.

Essential to an understanding of these factual findings is the status of the positions of the parties at the two critical periods at or near the time of marriage and at the time of separation. The plaintiff testified in detail as to the assets in her name prior to the marriage, including her estimate of value. The defendant produced an exhibit which likewise purported to list and value the assets of the plaintiff. That latter exhibit, according to defendant's testimony, was based on the values of some of the assets in the Federal Estate Tax return of the plaintiff's husband "giving her the benefit" as the husband put it, of any sales price information later acquired. Typical of most of the exhibits prepared and offered by the husband on the financial affairs of the parties, the exhibit is extremely self-serving, almost to the point of deception. Although defendant contends that the exhibit gives plaintiff the benefit of the sales price, in fact, the value shown is as to *cost* which in every instance was the value shown on Federal Estate Tax Return of plaintiff's first husband and, consequently, a value some years previous to the date of

the marriage of plaintiff and defendant. It omits almost $20,000 in savings accounts owned by plaintiff at the time of marriage. This fact has been verified from the deposit books which were offered in evidence by defendant. In any event, exercising the power of *de novo* review on the whole record, and exercising a fact finding function on the whole record, the property owned by the respective parties and its fair market value is determined to be as follows:

## NET WORTH OF PARTIES AT TIME OF MARRIAGE EXCLUDING HOUSEHOLD AND PERSONAL EFFECTS

### Una O. Singleton

| | |
|---|---:|
| General Savings Association | $265,000 |
| * Time deposits General Savings | 25,000 |
| * Kansas City Southern stock | 8,000 |
| Southgate State Bank stock | 20,000 |
| American Petrofina | 8,000 |
| Concrete Materials stock | 10,000 |
| J. C. Motors stock | 4,800 |
| WCV, Inc. stock | 15,000 |
| Safety Skate stock | 2,000 |
| General Motors | 10,000 |
| Notes due | 1,800 |
| Oldsmobile | 4,400 |
| Annuity contracts | 18,000 |
| GI insurance | 4,500 |
| General Insurance stock | 1,000 |
| | $396,500 |

*The items were reduced prior to marriage by sale of stock and withdrawal by a total of $18,000 paid to defendant's former wife. Plaintiff claims a loan for that amount to defendant.

### Donald O. Singleton

| | | |
|---|---:|---:|
| Don Singleton Olds stock | | $46,000 |
| Insurance and FIF | | 3,500 |
| | | $49,500 |
| Loans outstanding: | | |
| Rolla Singleton | $5,000 | |
| Exchange State Bank | 1,000 | |
| | $6,000 | ( 6,000) |
| | | $43,500 |

The defendant's assets and liabilities are taken as they are shown by him on his exhibit except that the liability has been increased to reflect the admissions he made on cross examination and the assets he conceded he had disposed of prior to marriage are not carried into the totals. The valuation of the Don Singleton Oldsmobile stock has been taken at 40% of shareholders' equity as shown by a defendant's exhibit which represented a September, 1965 audit of the books. This seems more than fair to the defendant since the audit some months previous discloses an overstatement of used car inventory of almost $6,000 which would have further reduced shareholders' equity and in view of the fact that, within a year, the stock was sold for $1.00.

The listing of the assets of the parties at the time of separation is considerably easier than placing a value on them and determining the manner in which they are held. From all the evidence, the following is found to be a fair value and reasonably accurate list of the assets of the parties at the time of separation.

It should also be noted that the value of articles of personal adornment and personal use have not been included.

The course of events leading from the status of the plaintiff's estate at the time of marriage to the diminished estate and holdings represented by the balance sheet showing the status of the parties at the separation is almost unbelievably convoluted and complex. The manner and form of the transactions which took place in the intervening period lend substance and form to the findings of the court with respect to the intent of the defendant.

| Description of Asset | Value of Property with Title Joint | Value of Property with Title in Una O. Singleton | Value of Property with Title in Don Singleton |
|---|---|---|---|
| Automobiles, 3 Cadillac & 1 Oldsmobile | $ | $ | $ unknown *** |
| Boat | | | 12,000 * |
| Annuities | | 4,000 | |
| Insurance (cash values) | | | 3,568 * |
| General Savings work contract | | 86,000 | |
| General Motors | | 8,000 | 8,000 |
| Lake Point West | 3,500 | | 1,500 |
| Commerce Trust stock | 1,875 | | |
| Southgate | 50,160 | | 9,460 |
| Levin Townsend bond | | | 500 |
| GMBC (Great Future Life) | 2,500 | | |
| WCV, Inc. | | 30,000 ** | |
| 916 Hulen Dr. & furnishings | 120,000 | | |
| Furnishings, Mizzou Motel | | | 24,000 * |
| Mizzou Motel | | | 132,000 |
| Scottsdale, Arizona | | 6,000 | 6,000 |
| Lake Hasavu | 2,000 | | |
| | $180,035 | $134,000 | $197,028 |

*Sold or cashed in by defendant after separation.

**This property acquired as the proceeds of condemnation litigation pending at the time of the death of plaintiff's first husband.

***The defendant's exhibit at the time of trial showed that these four automobiles were encumbered to the extent of $16,700, although his market value was only $15,000. The present state of the indebtedness is unknown.

Not necessarily in chronological order, but indicative of the scheme or design which appears in this record are the following facts. Even prior to the marriage the defendant obtained from the plaintiff funds with which to pay his obligation by way of property settlement on his former wife. Those funds, some prior to and some after the marriage, constituted in toto $18,000. The defendant asserts that this was a gift. The plaintiff asserts it was a loan. Within fourteen months after the marriage, the defendant sold his interest in a business which he asserted was worth $46,000 for $1.00. That terminated his only regular employment during the history of the marriage and any regular contribution by him to the assets of the parties. He claims that the diminution in value of the business occurred as a result of a strike, but he offered no documentary proof of the value of that corporation at the time of the sale offering only a balance sheet at or near the time of the marriage to demonstrate the supposed value of the corporation. It is apparent from the defendant's offered proof that the General Motors Corporation owned the major portion of the stock in the dealership the plaintiff claimed as his asset, and it is inconceivable that there were not continuing and regular reportings of the operations of that company which would have shed some light on the defendant's claim with respect to the causes of the loss of value. It is significant that the sale of this asset which constituted almost the entire estate of the defendant occurred almost simultaneously with the disposition by the plaintiff of her interest in the General Savings and Loan Association for $145,000 in cash and a "work contract" which yielded $1,000 per month for ten years. The defendant thereupon embarked upon a series of speculations in the stock market which, over a period of months, with some gains but more frequent losses, resulted in a net loss to the parties, of $4,659.09, the funds for the stockmarket speculation coming almost entirely from the assets of the plaintiff converted to cash and deposited in joint accounts. After this debacle, plaintiff and the defendant moved to Columbia, Missouri, and then ensued the other manipulations of the plaintiff's property which have resulted in the present state of affairs.

The most revealing of these transactions is the manner in which the defendant handled the transaction which is referred to as the purchase of the "Mizzou Motel." This property had been owned by the defendant, his former wife, and his mother and father prior to his second marriage. This first acquisition was in 1961 from an individual named Hackethorn for a purchase price of $57,500. Ten thousand dollars of the purchase price was in cash and Forty-Seven thousand five hundred dollars was secured by a note and a first deed of trust to Hackethorn. In October, 1963, the motel was deeded to defendant's father by the defendant, his then-wife, and his father and mother. This conveyance was subject to the balance due on the Hackethorn note in the amount of $41,284.57. The defendant claims he made the conveyance to avoid the exposure of his interest in the motel to the risk of loss inherent in the automobile dealership he was embarking upon. Defendant obviously considered that he had a right to repurchase but the terms of any such agreement between defendant and his mother and father does not appear despite defendant's claim the agreement was in writing. In any event, the defendant and plaintiff discussed the repurchase of the motel in late 1966. Defendant claims that in discussions with an accountant, it was disclosed that the title to the motel would be placed in his name and that this matter was "rediscussed" with the accountant in early spring of 1967 after transfer of title had been made to the defendant alone. Plaintiff, on the other hand, vehemently insists that the title to the motel was to be joint and that she did not discover that it was not until immediately prior to the parties' separation. Upon confronting defendant with that discovery, she claims the defendant

first asserted it was a mistake and that he would have it fixed. Later, he said he was not going to change the title and left the home, not again returning except to pick up his clothes.

Despite his protestation and claim that it was intended that the plaintiff have no interest in the motel because of the defendant's claim that this constituted some sort of a tax advantage to the parties, the handling of the Mizzou Motel account further substantiates the inference of an intent and scheme on the part of the defendant to obtain control of the plaintiff's property. He obtained the plaintiff's signature on the note and second mortgage payable to his parents and thereafter channeled into the bank account of the Mizzou Motel loan proceeds from loans secured by assets of the plaintiff, some of the payments on the so-called "work contract" and proceeds from the joint accounts used to purchase furniture and fixtures for the motel, as well as to pay operating expenses of the motel. Although the defendant claimed that the second mortgage to his parents on the motel was in default from inception, the record demonstrates that over $11,000 was paid to his parents which would have almost exactly equaled 58 months of payments at $200 per month. Although the defendant's testimony is quite confusing on this point, his claimed explanation for these payments to his father were with respect to an undisclosed loan of $5,000 which was owing at the time of the marriage, although there is a strong indication in the record that if such a debt existed it had long since been forgiven.

The records of the motel account produced by the defendant show that checks written to Rolla and Etta Singleton or either of them, as well as to Hackethorn, the holder of the first mortgage, were not spread to interest and principal accounts, except annually. The 1967 records produced by defendant show payments to Etta Singleton and Rolla Singleton, but no designation of the nature of the payment. The records produced by plaintiff in defendant's handwriting have all such checks to the Singletons marked as "2nd" or "2nd mort." In 1968 even the records produced by defendant show payments to Etta Singleton and a computation of "interest portion" for the year.

Under ordinary circumstances, an accounting of all of these complex and conflicting transfers and claimed expenditures should properly receive the attention of a commissioner on an accounting. An examination of this record convinces this court that to require an accounting at this stage of these parties' relationship would only serve to further deny to the plaintiff the relief to which she is entitled under the facts. In all likelihood because of the loose methods of accounting, such an accounting would prove to be a futile act.

Other dealings of the defendant demonstrate the scheme and intent with which he dealt with the plaintiff's property. He claims the ownership of 100 shares of General Motors stock. With respect to that 100 shares and with respect to the Levin Townsend bond which he also claims, he obviously was attempting to conceal from his wife the source of payment and ownership of both. As to the bond, he directed that it be sent to his parents' address, and she never knew of it until discovery at trial. As to the General Motors stock obtained very early in the marriage, he directed that the certificate be mailed to his former wife's address, although the stock was purchased through a trading account in the joint name. At the time of the purchase, within a month of the marriage, the purchase price of approximately $10,000 could only have come from the funds of the plaintiff arising from the sale of her separate estate and flowing into the joint stock account from joint accounts established with those funds. To further show the intent of the defendant even *prior* to the marriage was his repeated assertion to her that he "owned" General Motors stock. In the discussion of the source of the funds for his divorce settle-

ment prior to the marriage, plaintiff suggested he sell "his" General Motors stock, and the defendant indicated that his ownership of that stock was somehow necessary in connection with the "dealership." Understandably, at trial time, plaintiff on cross examination said that in the light of her then knowledge, she assumed the hasty purchase of the General Motors stock in *his* name was to prevent her discovery of the falseness of his claim to prior ownership. On December 10, a few days over a month after marriage, he received a dividend check on that stock which he assured plaintiff was the dividend on "his" stock, lending support to his claim of prior ownership. Ironically, the 100 shares of General Motors owned by plaintiff was pledged to secure a loan which apparently still has an outstanding balance of $7,500. The defendant presented an exhibit purporting to show that the proceeds went for furniture in the house and a trip, but the amount is far less than the loan and the loan application indicates the proceeds were to be used to remodel the Mizzou Motel.

The significance of this matter again relates to the inference that arises as to the defendant's intent. The plaintiff offered a *fragment of the early records of the "Mizzou Motel"* which were in the defendant's handwriting. These records show the loan proceeds as being deposited in the motel account. Likewise, and on the *same date,* checks were written for over $4,200 for improvements to the motel as well as over $1,000 in repairs and maintenance. The balance of the loan was, as indicated by defendant, used for items connected with the home. Thus, the pattern again emerges of the sole property of the plaintiff being sold or encumbered and the proceeds utilized to enhance the value of defendant's solely owned property or converted to jointly owned property.

He represented to the plaintiff that it was necessary for her to transfer to him stock in the Southgate Bank in order to help his credit rating and then pledged dividend shares on the Southgate stock without even obtaining the plaintiff's signature on the pledge instrument or to a stock certificate.

He represented to the plaintiff in connection with the purchase of an investment known as GMBC that some of the stock should be placed in his name so that he might be on the Board.

He obtained the plaintiff's agreement to buy some stock in Lakepoint West upon the representation that he would sign a share loan agreement on her daughter's savings account at the General Savings and Loan Association to secure the payment of the daughter's funds which had been used in the investment. He never signed such a share loan. He purchased two boats and titled them in his own name and, subsequent to the separation, immediately liquidated what remaining value there was in the remaining boat to his own benefit. Likewise, he represented that there would be cross ownership on the life insurance purchased, but, in fact, sometime after the separation, he withdrew the entire cash value of the policies of insurance on the plaintiff's life and his own policies. Indicative of the over-all situation is the fact that plaintiff's exhibits demonstrated that there was a total of $373,712 deposited to the three joint bank accounts of which the plaintiff was the source of $266,308, the defendant $10,129, and from the sale of assets acquired from the joint account and liabilities incurred after the marriage $89,171, and from other sources $8,102. The sole contribution so far as this record discloses in terms of earnings by the defendant during the five years prior to the parties' separation consisted of $900 a month salary from the marriage in November of 1965 to February of 1967, a period of sixteen months, and a single real estate commission. He claimed to have also engaged in the purchase and sale of automobiles in the Mizzou Motel account, but that is entirely specious in the light of the records which show that $37,869 was expended for

automobiles, and $14,400 was received from the sale of automobiles. Another transaction which demonstrates the intent of the defendant is the Columbia National Bank stock transaction. This stock was purchased for about $1,200 and the shares were issued in the joint name of the plaintiff and defendant. Subsequently, by reason, apparently, of a merger, these were converted to Commerce Bank shares, and the defendant claimed at first that they were sold to his mother for $1,875. The plaintiff denied any such intent to sell, and the defendant did not report any capital gain on that purported sale. Defendant's subsequent testimony discloses that this was, in reality, some sort of a loan, but the stock certificate signed in blank was kept in his mother's safety deposit box. The defendant's shifting posture, both on the acts relating to marital infidelity and the complex financial transaction demonstrates again the underlying intent to deprive the plaintiff of the substantial part of her inheritance. Even at trial, the defendant, until confronted with the facts, made a claim by way of an exhibit that over $12,000 had been expended on the children of the plaintiff. The facts as developed showed that $3,200 of this represented a car purchased by the plaintiff for one of her children representing his share of the proceeds of real estate inherited through his father and uncles and there had been deposits from the children of $7,863, leaving a net expenditure on the children of $534 during the years of the marriage.

Upon the basis of these facts, it would be a travesty to hold otherwise than in favor of the plaintiff on the issue of the defendant's intent and scheme to secure the ownership of her separate property.

Once having determined as a finding of fact that the defendant intended by this scheme to defraud the plaintiff of her inheritance, the application of controlling law is not difficult.

Plaintiff cites and relies upon *Steines v. Steines*, 338 Mo. 335, 89 S.W.2d 520 (1936); *Stumpf v. Stumpf*, 7 Mo.App. 272 (1879); *Turner v. Turner*, 44 Mo. 535 (1869). Without detailing the facts in these cases, they undoubtedly stand for the proposition which plaintiff asserts, that when intraspousal transfers are based upon a scheme or device to obtain the separate property of the other spouse and such intent and scheme is found to factually exist, then the transfers will be voided.[1] Fraudulent intent is unlikely to ever be directly proven, but circumstances will suffice to prove fraud as any other fact. *Basman v. Frank*, 250 S.W.2d 989 (Mo.1952). What has been said is enough to answer defendant's only attack upon the authority of the cases cited by plaintiff that no fraud was proven. The cases cited under this portion of the defendant's argument are all factually distinguishable. As noted in the reply brief of the plaintiff, the defendant argues the best possible view of the facts to assert that no scheme existed and ignores the evidence and inferences detailed at length in the preceding factual statement which this court believes make a finding of such a fraudulent scheme unavoidable.

This factual argument of the defendant rests entirely upon an acceptance of the defendant's protestations of innocent intent in dealing with plaintiff's property. Despite whatever protestations occur in the cases with respect to the fault of the parties vis-a-vis the distribution of their worldly goods, the fact of fault looms large in the balance when issues of credibility are involved. When the evidence of fault is clear and convincing and the denial, at first vehement, becomes desultory and, finally, a sullen admission, something is felt as to veracity and disclosure. That feeling of innate distrust of testimony entirely directed to self-vindication cannot help but affect judgments on testimony in which pecuniary interest is involved. So here protestations of

---

1. See also *McHenry v. Brown*, 388 S.W.2d 797 (Mo.1965).

economic purity cannot be equated with ultimate admissions of personal immorality without suffering the penalty of disbelief.

The sordid revelations of the immorality of the defendant weigh heavier in the scales by reason of the manner in which they emerge in the trial. First, deposition testimony which, when not equivocal, denies any wrongdoing. Then, when faced with specific testimony of independent witnesses, comes the sullen admission that, with not one but five (that could be identified by defendant) separate individuals, the defendant had engaged in illicit sexual relationships. These admissions embrace the period of time when plaintiff had no reason to suspect defendant of infidelity, either personally or in the area of the management of the family finances.

Nor was the defendant helpful to his cause in the preparation of the exhibits he offered the court in support of his proof. Mentioned earlier is the exhibit offered to demonstrate the claim by defendant that plaintiff made contributions to her children from joint funds. At this point, it is sufficient to say that even in the heat of trial the validity of that exhibit was demolished by specific and detailed testimony demonstrating the overreaching of the defendant on that issue. A prime example is the attempt to include in that exhibit as an expenditure on behalf of the plaintiff's children amounts which were clearly offset by deposits from the children's savings and checking accounts. So also his reluctant admission of the use of her children's separately owned savings accounts as collateral for loans he did not sign although he promised to do so, the proceeds of which were used to purchase assets in which he now claims an interest.

There is no specific area of the trial court's findings which can be reasonably said to relate to the issue of credibility of the defendant, and deference is not really involved. In any event, deference does not require blindness.

Reducing then the ultimate issue of this appeal to the singular one of intent, there can be no question on the whole record that the intent of the defendant was to impoverish the plaintiff and to implement a plan for the ultimate succession of defendant to her property, either by survival or by transfer to his sole name.

■ Two other contentions of defendant should be briefly noted. First, the defendant in his brief for the first time asserts that the Kansas statutes and case law govern because of the early residence of the parties in Kansas and the fact that some of the early accounts were in Kansas banks. The defendant did not comply with Rule 55.23, V.A.M.R., requiring that the pleadings assert the reliance upon the law of another state. When such reliance is not shown, the courts of Missouri will apply the case law and statutes of Missouri. *Citizens Fidelity Bank & Trust Co. v. Kilpatrick*, 231 S.W.2d 301 (Mo.App.1950). Nor is there any allegation of fact in the amended petition or answer and counterclaim which would serve to alert the trial court to apply the law of any state but Missouri. The defendant in his brief concedes that the issue of the applicability of the Kansas law was never raised in the trial court.

■ Second, defendant asserts that because of the fact that the asserts were all purchased with funds which flowed through joint accounts, they are immune from any attack. A great many cases are cited by defendant for the proposition that the creation of a joint tenancy or joint account presumptively establishes a gift. As noted in one of the defendant's cited cases, *Davis v. Broughton*, 369 S.W.2d 857, 862 (Mo.App. 1963), such a presumption is rebuttable. The evidence here clearly demonstrates that the fraudulent scheme and intent of the defendant would vitiate any such presumptive intent by the plaintiff if her plain and unequivocal denial of such an intent did not. All of the cases cited by the defendant have been examined, and they are factually

distinguishable. The plaintiff's reply brief has, in detail, distinguished the authority cited, and upon examination of the cases, this court concludes that the distinctions are appropriate.

Turning now to the ultimate disposition of this lengthy and acrimonious dispute, the resolution of which has been too long delayed, it is clear that this court should direct the entry of a final order disposing of all disputes between these parties pursuant to the power to enter, in a court-tried case, the decree the trial court should have entered.

■ Before recitation of the directions necessary to the entry of a decree, one further point should be made. The effect of the court's holding on the single issue of a fraudulent scheme and intent on the part of the defendant will require the entry of a decree divesting defendant of all interest in the jointly owned property and the property owned in his separate name. Such a result might, in the ordinary case, seem harsh, but there are factors in this case which support the entry of such a decree over and above the effect of the legal and equitable consequences flowing from the basic finding of a general scheme and intent to obtain the plaintiff's separate estate. As previously noted, an accounting from defendant would ordinarily be required. Such an accounting seems hopeless in the tangled state of this record. Nonetheless, even a cursory examination of the Mizzou Motel account shows each year thousands of dollars in personal withdrawals by the defendant, most of them in the form of checks to cash. Likewise, at this late date, the proceeds of the motel furniture, the life insurance, and the boats have been likewise dissipated, and any judgment against the defendant for these proceeds would appear to be a futile gesture. Also to be noted is the fact that many of the assets still in existence are subject to outstanding indebtedness, and the plaintiff will perforce be required to liquidate some holdings in order to accomplish the redemption of these assets. So also it appears that plaintiff's obligation on the outstanding indebtedness on the "Mizzou Motel" property is far from clear and the plaintiff may be required to litigate the validity and amount of the indebtedness. The same may be true as to some of the other personal property.

So also, the plaintiff's argument she should receive an award for alimony and attorney fees would, in different circumstances, require consideration. Again, the futility of a money judgment against the defendant in favor of the now 63-year-old plaintiff seems apparent.

Based then upon broad equitable principles tempered only by the practicalities of decreeing effective relief, the trial court shall enter a decree in accordance with the following directions.

First, the plaintiff shall be granted an absolute divorce.

Second, the title to all property standing in the name of plaintiff alone shall be confirmed in her, subject to any existing valid encumbrance to third parties, and any claim of the defendant thereto shall be extinguished and any purported assignment to him declared void.

Third, the decree shall direct and require that the defendant make, execute and deliver to the plaintiff any and all instruments, assignments or conveyances necessary to vest title in the plaintiff in the following items of personal property and real estate:

a) One Oldsmobile automobile presently used by the plaintiff as her personal vehicle, provided, however, that in the event the plaintiff does not elect to assume the indebtedness thereon, the title thereto shall not be transferred. Such indebtedness shall be assumed as of the date of transfer.

b) One hundred shares of stock in the General Motors Corporation subject to any valid indebtedness due third parties.

Such conveyance shall include, if any, stock dividends accruing since the date of purchase either in kind or at current market value if sold by defendant.

c) One thousand five hundred shares of Lakepoint West Development Company standing in the name of defendant. The defendant shall also be required to convey all his interest in the 3,500 shares of this company standing in the joint name at the time of the separation. If any dividends in stock have been declared, the dividend stock shall also be so conveyed; if disposed of, the defendant shall account for the proceeds of the sale.

d) As to any shares of stock in the Commerce Bank, the defendant shall convey his interest therein to the plaintiff.

e) Defendant shall convey his one-half interest in the 456 shares of Southgate Bank stock standing in joint name to plaintiff as her sole property. As to the 86 shares of Southgate Bank stock standing in the name of defendant, the same shall be conveyed to plaintiff as well as any subsequent dividends in kind on all such stock.

f) The Levin Townsend bond standing in the name of the defendant shall be transferred to the sole ownership of the plaintiff.

g) Any interest of defendant in 2,500 shares of GMBC corporation jointly titled in plaintiff and defendant shall be conveyed to plaintiff. Defendant shall convey the 7,500 shares of GMBC in his own name to plaintiff. This stock may now be represented by a certificate in defendant's name alone for 1,647 shares of Great Future Life Investment Corporation, and it is intended that the trial court shall enter such order as may be necessary to divest defendant of the GMBC stock or its proceeds in any other corporation formed therefrom, as well as any and all stock dividends or distributions in kind on dissolution, if any.

h) Defendant shall convey to plaintiff all his right, title and interest in and to the household goods and furnishings located in the home at 916 Hulen Drive, Columbia, Missouri.

Fourth, the decree shall order and direct the defendant to convey all his right, title and interest in and to the four tracts of real estate described in the evidence as:

a) 916 Hulen Drive, Columbia, Missouri;

b) The Scottsdale, Arizona property;

c) The Lake Hasavu property;

d) The Mizzou Motel, Columbia, Missouri.

Such conveyances shall be subject only to valid and existing liens to third parties, and neither the decree nor conveyance shall foreclose the plaintiff's assertion of the amount or validity of any claimed liens thereon.

Fifth, any assets at the time of separation as to which a specific direction is not made but which are still subject to a claim of right by the defendant shall be conveyed by him to the extent of his interest therein. This provision shall not apply to jewelry nor to articles of clothing or personal use.

Sixth, upon finality of any decree entered and the failure of defendant to convey as herein directed, the trial court shall, by appropriate order, direct such conveyances as are necessary to effectuate the decree.

Seventh, no other or further relief shall be given the plaintiff and the prayer of her petition as to all other matters, including but not limited to an accounting, money judgments, or alimony and attorney fees shall be denied.

In view of the complicated nature of the decree to be entered and because of the lapse of time, some evidence may be required to enter a final decree. The trial court is authorized, but not directed, to require the parties to present such evidence as is necessary to enter a final decree.

Judgment reversed and cause remanded with directions.

All concur.